UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Dynamic Air, Inc.,

Plaintiff,

v.

Boccard S.A., a French business entity doing business in the United States,

Defendant.

Civ. No. 01-2148 (JNE/JGL)
ORDER

---

Edward Fox, Esq., and Carey S. Meyer, Esq., Oppenheimer Wolff & Donnelly LLP, appeared for Plaintiff Dynamic Air, Inc.

Bradley Betlach, Esq., Halleland Lewis Nilan Sipkins & Johnson, appeared for Defendant Boccard S.A.

---

This is an action by Dynamic Air, Inc. against Boccard S.A. for breach of contract. Boccard asserts counterclaims for breach of contract and defamation. The case is before the Court on Dynamic Air's Motion for Summary Judgment. For the reasons set forth below, the Court grants the motion.

## I. BACKGROUND

Dynamic Air designs and manufactures pneumatic conveying systems for industrial purposes. Dynamic Air has entered into licensee agreements for foreign distribution and sale of its pneumatic technology and parts. One such agreement (Original Licensee Agreement) existed between Seriaco, a French company, and Dynamic Air. Seriaco went bankrupt in June 1997 and Boccard purchased the rights to the Original Licensee Agreement. In May 1998, Boccard and Dynamic Air entered into an Amended Licensee Agreement (Amended Agreement) that adopted the Original Licensee Agreement and created new mutual obligations.

FILED SEP 04 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED SEP 04 2003
DEPUTY CLERK'S INITIALS

In January 2000, Boccard contracted with SKW, a Belgian company, to manufacture a pneumatic system using Dynamic Air products (SKW system). Boccard designed the SKW system and completed installation by the end of April 2000. Dynamic Air sold the products to Boccard for use in the system, but was not involved in the design or installation process. From the start of production, the SKW system had plugging problems—that is, the SKW product, gelatin, coagulated at points as it was moved through the system, causing the system to block and not achieve its contractual rate. The contractual rate is the speed at which SKW and Boccard agreed the SKW system would convey the gelatin (*e.g.*, 12 tons/hour). At the end of July 2000, Boccard requested Dynamic Air's technical assistance to help solve the plugging problems. From July 31, 2000, through December 2000 (troubleshooting period), Dynamic Air and Boccard worked together, mostly via e-mail, to find a solution. Numerous adjustments were made to the SKW system in an effort to reach the contractual rate. By process of elimination, the parties determined in late October that the switches were the last cause of the plugging problems. In early November, Boccard re-oriented switches and the SKW system attained the contractual rate.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving

party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Dynamic Air's motion seeks the following: (1) summary judgment on its claim for breach of contract against Boccard; and (2) summary judgment on Boccard's counterclaims for breach of contract and defamation.

**A. Dynamic Air's Breach of Contract Claim**

*1. Liability*

Dynamic Air asserts that Boccard failed to pay Minimum Royalties in violation of Section 5 of the Amended Agreement. Under Section 5(a), Boccard must pay Minimum Royalties to Dynamic Air in the amount of $70,000.00 for the year 2000, and $100,000.00 for the year 2001. Boccard opposes the motion on the ground that Dynamic Air breached the contract first by failing to render certain services under Article 4 of the Original Licensee Agreement. Specifically, Boccard contends that Articles 4(a) and 4(d) required Dynamic Air to render technical assistance with the SKW system during the troubleshooting period. Boccard argues Dynamic Air failed to render such assistance by not identifying the problem related to the switches earlier, causing Boccard unnecessary expense and delay.

Under Minnesota law, the interpretation of an unambiguous contract presents a question of law. *Trondson v. Janikula*, 458 N.W.2d 679, 681 (Minn. 1980). The initial question of whether a contract is ambiguous is a question of law to be decided by the trial court. *Lamb Plumbing & Heating Co. v. Kraus-Anderson*, 296 N.W.2d 859, 862 (Minn. 1980). Ambiguity

exists if the language of a contract is reasonably susceptible to more than one meaning. *Trondson*, 458 N.W.2d at 681. A court must construe a contract as a whole and attempt to harmonize all of its clauses. *Chergosky v. Crosstown Bell*, 463 N.W.2d 522, 525 (Minn. 1990).

Article 4(a) provides that Dynamic Air shall render "the latest technical information in its possession for [Boccard] to use *in designing* and *building* systems." (Emphasis added). Boccard argues that the assistance Dynamic Air provided from July to December 2000 was insufficient to satisfy its obligations under Article 4(a). Boccard essentially interprets Article 4(a) to obligate Dynamic Air to render technical advice and assistance before, during, and after the designing and building of a system. The Court rejects this argument. Article 4(a) unambiguously requires Dynamic Air to provide technical information for Boccard to use while it designs and builds a system. Article 4(a) does not impose duties on Dynamic Air after the designing and building phases are completed. Accordingly, Boccard's reliance on Article 4(a) to establish Dynamic Air's breach is misplaced.

Turning to Boccard's argument that Dynamic Air breached its obligation to render technical assistance under Article 4(d), that provision states: "In the event that any Contractual Products *built* and *checked* to Dynamic Air's drawings and specifications proves to be faulty, Dynamic Air will provide technical assistance to [Boccard] at no charge to [Boccard] to try to remedy or correct that fault." (Emphasis added). At the outset, the Court notes that Article 1(eeee) of the Original Licensee Agreement defines Contractual Products to include the switches at issue in this case. Article 1(eeee) also provides that "Contractual Products shall not include any installation of the Contractual Products." Reading the contract as a whole, the terms of Article 4(d) are unambiguous. If a Contractual Product is faulty, then Dynamic Air must endeavor to fix it. If a Contractual Product is improperly installed, however, then Dynamic Air

has no remedial obligation. It is undisputed that the reorientation of the switches eliminated the plugging problems. In other words, the switches themselves were not faulty. Rather, they were improperly installed. Thus, Dynamic Air had no obligation to render assistance under Article 4(d).

In short, Section 5 of the Amended Agreement obligates Boccard to pay Minimum Royalties. Boccard's argument that it need not pay Minimum Royalties because Dynamic Air breached first is not supported by the unambiguous language in the Original Licensee Agreement. There being no dispute as to Boccard's failure to pay, Dynamic Air is entitled to summary judgment as to the issue of Boccard's liability for breach of contract.

2. *Damages*

Section 5(c) of the Amended Agreement provides that Minimum Royalties will be reduced by Boccard's payment of other royalties. Section 6 of the Amended Agreement imposes 18% interest per annum on amounts past due, including Minimum Royalties. It is undisputed that Boccard made excess royalty payments in 1999, reducing the amount of Minimum Royalties owed for 2000 from $70,000.00 to $58,647.92. Although the parties agree that Boccard does not owe the full amount of Minimum Royalties for 2001 because it terminated the contractual relationship on July 13, 2001, they dispute the amount owed. Resolution of this dispute depends on the effective date of termination. If Boccard terminated with cause, the parties agree that the effective date of termination is July 13, 2001. Conversely, if Boccard terminated the contract without cause, the effective date of termination is forty-five days after July 13, 2001, pursuant to Article 11(c)[1]. Again, Boccard's contention that Dynamic Air failed to satisfy its obligations set forth in Articles 4(a) and 4(d) is unavailing. Thus, Boccard terminated the contract without

---

1 Section 7 of the Amended Agreement added paragraph (c) to Article 11 of the Original Licensee Agreement.

cause and the effective date of termination is forty-five days after July 13, 2001. Accordingly, Boccard owes Minimum Royalties for 2001 in the pro-rated amount of $66,666.67. In sum, Boccard is liable for Minimum Royalties in the amount of $58,647.92 plus 18% interest from January 31, 2001, and $66,666.67 plus 18% interest from January 31, 2002, to the date of this Order.

## B. Boccard's Counterclaims

### *1. Breach of Contract*

Dynamic Air asserts it is entitled to summary judgment on Boccard's breach of contract counterclaim because Dynamic Air fulfilled its obligations under the contract with regard to the SKW system. Boccard opposes the motion by alleging Dynamic Air breached Articles 4(a) and 4(d) of the Original Licensee Agreement, and Section 11(b) of the Amended Agreement. As discussed above, Boccard's reliance on Articles 4(a) and 4(d) is misplaced.

The same conclusion is warranted with respect to Boccard's reliance on Section 11(b). Section 11(b) provides:

> When Boccard obtains an order for a Dynamic System, it shall submit to Dynamic a copy of the proposal sent to the customer, a copy of the purchase order, a process flow diagram of the system and the cost estimate sheets. After Boccard completes the necessary engineering drawings, and *before fabrication*, Boccard shall also submit to Dynamic the general arrangement drawings and the piping and instrument diagrams. Dynamic shall conduct a technical review of these materials at no cost to Boccard. Boccard shall implement all engineering changes requested by Dynamic.

(Emphasis added). Boccard argues that Dynamic Air breached Section 11(b) by failing to render technical assistance during the troubleshooting period, specifically with regard to the problems of the switches. The unambiguous language of Section 11(b) articulates the parties' duties *before* fabrication. Section 11(b) does not create duties that extend into the troubleshooting period. In short, none of the provisions identified by Boccard support its breach of contract

counterclaim. The Court grants Dynamic Air's motion on this claim.

2. *Defamation*

Dynamic Air maintains it is entitled to summary judgment on Boccard's defamation counterclaim because Boccard cannot establish the elements of the claim. Alternatively, Dynamic Air asserts it is entitled to a qualified privilege. Boccard's claim stems from an e-mail written by Dynamic Air's President, James Steele, to SKW in September 2000. The e-mail responded to a letter James Steele received from SKW requesting Dynamic Air's help with the SKW system. The e-mail states in relevant part:

> I have been personally involved in this matter since [our technician] visited your facility for the first time. Unfortunately, Boccard has not adhered to certain procedures agreed upon in our licensee agreement, or this would have never happened in the first place. In fact if Boccard does not correct [its] mistakes, [Boccard] will lose [its] Dynamic Air Inc., license. I do think Boccard is trying to make corrections and now realize the mistakes they have made.
>
> ....
>
> I would hope that all the errors can be quickly corrected by Boccard, however should you need anything further, we will be more than happy to respond accordingly. Dynamic Air Inc., and Dynamic Air LTD has [*sic*] acted as quickly as possible in what is a bad situation, but this contract must be the responsibility of Boccard. We will continue to provide all technical assistance, as might be required and if you have further questions, we will be most happy to help!
>
> ....
>
> I can only apologize for what has happened and hope we get you through these problems expeditiously.

To be defamatory, a statement (1) must be communicated to a third party, (2) it must be false, and (3) it must tend to harm the plaintiff's reputation. *Stuempges v. Parke, Davis Co.*, 297 N.W.2d 252, 255 (Minn. 1980). Truth is a complete defense even if the statements are disparaging. *See id.* In the case at hand, the parties dispute only whether the statements were false. "Whether a statement can be interpreted as stating facts or can be proven false is a question of law." *McClure v. Am. Family Mutual Ins. Co.*, 223 F.3d 845 (8th Cir. 2000) (quoting

*Geraci v. Eckankar*, 526 N.W.2d 391, 397 (Minn. Ct. App. 1995)). Although it appears unlikely that the e-mail is defamatory, the Court need not reach a determination of falsity because Dynamic Air is entitled to a qualified privilege.

Minnesota's law on defamation recognizes a qualified privilege for communications "made upon a proper occasion, from a proper motive and based upon reasonable or probable cause." *McBride v. Sears, Roebuck & Co.*, 235 N.W.2d 371, 374 (Minn. 1975) (citing *Hebner v. Great N. Ry. Co.*, 80 N.W. 1128, 1129 (Minn. 1899)). A defendant asserting a defense of qualified privilege "must show that an otherwise defamatory statement was made in good faith by a speaker who had an interest or duty with respect to the subject matter to a person having a corresponding interest or duty." *Ferrell v. Cross*, 557 N.W.2d 560, 567 (Minn. 1997). Existence of a qualified privilege is a matter of law for the Court to decide. *McClure*, 223 F.3d at 854. If a defamatory statement is protected by such a qualified privilege, a plaintiff may rebut the privilege only upon a showing of actual malice. *McBride*, 235 N.W.2d at 374.

Dynamic Air asserts that a qualified privilege protects James Steele's e-mail. Because SKW solicited James Steele's response regarding the SKW system and Boccard, he sent the e-mail upon a "proper occasion". As President of Dynamic Air, James Steele is responsible for responding to and addressing problems associated with Dynamic Air. He therefore had a "proper motive" to respond to SKW's concerns. Having been personally involved in troubleshooting the SKW system, James Steele had "probable cause" to speak on the issues raised. The e-mail's multiple references to fixing the problems and obtaining a beneficial outcome for all parties indicate that the e-mail was made in good faith. The Court thus concludes that James Steele's e-mail satisfies the conditions of the qualified privilege.

To survive summary judgment, Boccard must demonstrate that the qualified privilege

was abused because James Steele made the statements with actual malice. Actual malice has been defined as "actual ill will, or a design causelessly and wantonly to injure plaintiff." *McBride*, 235 N.W.2d at 375. Actual malice may be proven by "extrinsic evidence of personal spite, as well as by intrinsic evidence such as the exaggerated language of the libel, the character of the language used, the mode and extent of publication and other matters in excess of the privilege." *Bol v. Cole*, 561 N.W.2d 143, 149 (Minn. 1997) (internal citations and quotations omitted).

Boccard relies on two pieces of extrinsic evidence to establish James Steele's actual malice. First, Boccard offers the testimony of Greg Steele, Dynamic Air's Executive Vice President, taken at a deposition in January 2003. The testimony discusses litigation between the parties that preceded the execution of the Amended Agreement in 1998. More than two years separates the conclusion of the litigation and the writing of the e-mail. In that time, Dynamic Air and Boccard successfully transacted business. Assuming the deposition testimony evinces Dynamic Air's ill will towards Boccard prior to the Amended Agreement, there is no basis to impute that ill will to James Steele when he wrote the e-mail two years later. Second, Boccard offers James Steele's deposition testimony, also taken in January 2003. The proffered testimony was a response to Boccard's request to speculate on a topic of which James Steele had already admitted having no knowledge. This rank speculation does not support an inference that twenty-eight months before his testimony, James Steele harbored ill will towards Boccard. Although malice is usually an issue of fact to be decided by a jury, *Thompson v. Olsten Kimberly Qualitycare, Inc.*, 33 F. Supp. 2d 806, 816 (D. Minn. 1999), Boccard has not identified any evidence to create an issue of fact as to James Steele's actual malice. Accordingly, the Court

grants Dynamic Air's motion on Boccard's defamation counterclaim.[2]

## III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Plaintiff's Motion for Summary Judgment [Docket No. 18] is GRANTED.

2. Defendant is liable to Plaintiff for Minimum Royalties for 2000 in the amount of $58,647.92 plus 18 % interest from January 31, 2001 to the date of this order.

3. Defendant is liable to Plaintiff for Minimum Royalties for 2001 in the amount of $66,666.67 plus 18 % interest from January 31, 2002 to the date of this order.

4. Defendant's Counterclaim for Breach of Contract is DISMISSED.

5. Defendant's Counterclaim for Defamation is DISMISSED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 4, 2003

s/ JNE

JOAN N. ERICKSEN
United States District Judge

---

2 Having granted Dynamic Air's motion on its claim for breach of contract and on Boccard's counterclaims, the Court need not consider Dynamic Air's request for a declaratory judgment that Boccard breached Section 11(b) of the Amended Agreement.

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*